FILED
April 27, 2009
CLERK, U.S. BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA
0001795155

JEFFER, MANGELS, BUTLER & MARMARO LLP
ROBERT B. KAPLAN (Bar. No. 76950)
NICOLAS De LANCIE (Bar. No. 84934)
Two Embarcadero Center, Fifth Floor
San Francisco, California 94111-3824
Telephone:   (415) 398-8080
Facsimile:   (415) 398-5584
e-mail:      rbk@jmbm.com
e-mail:      nde@jmbm.com

Attorneys for Secured Creditor
PACIFIC COAST BANKERS' BANK, as Agent

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF CALIFORNIA

SACRAMENTO DIVISION

| | |
|---|---|
| In re<br><br>SUMMERFIELD APARTMENTS IN DIXON, LLC,<br><br>          Debtor. | Case No. 09-26417 CMK<br><br>Chapter 11<br><br>Docket Control Nos.<br>WFH-1, WFH-2, and WFH-3<br><br>Hearing:<br><br>April 28, 2009<br>9:30 a.m.<br>Honorable Christopher M. Klein, Jr.<br>Department C, Courtroom 35<br>United States Courthouse<br>501 I Street<br>Sacramento, California 95814 |

**PRELIMINARY OBJECTION OF
PACIFIC COAST BANKERS' BANK, AS AGENT, TO
DEBTOR'S (I) MOTION FOR AUTHORITY TO INCUR
POST-PETITION BORROWING; (II) APPLICATION
FOR EMPLOYMENT OF WILKE FLEURY; AND
(III) MOTION FOR ORDER (1) AUTHORIZING LEASING OF
REAL PROPERTY; (2) AUTHORIZING EMPLOYMENT OF
PROPERTY MANAGEMENT COMPANY; (3) AUTHORIZING USE OF
CASH COLLATERAL; AND (4) AUTHORIZING POSTPETITION BORROWING**

PACIFIC COAST BANKERS' BANK ("**PCBB**"), as Agent (in such capacity, the "**Agent**") for BANK OF SACRAMENTO (the "**Bank**"), a secured creditor in the above-captioned bankruptcy case (the "**Case**") under Chapter 11 of the Bankruptcy Code[1], wherein SUMMERFIELD APARTMENTS IN DIXON, LLC, a California limited liability company (the "**Debtor**"), is the debtor and debtor-in-possession, by this Preliminary Objection to Debtor's (i) Motion for Authority to Incur Post-Petition Borrowing; (ii) Application for Employment of Wilke Fleury; and (iii) Motion for Order (1) Authorizing Leasing of Real Property; (2) Authorizing Employment of Property Management Company; (3) Authorizing Use of Cash Collateral; and (4) Authorizing Postpetition Borrowing (this objection, this "**Objection**"), hereby respectfully objects to those motions and applications (collectively, the "**Motions**"). The first-noted borrowing motion was filed in the Case on April 8, 2009 [Docket No. 7 and Docket Control No. WFH-2] (the "**First Borrowing Motion**"); the Wilke Fleury employment application was filed in the Case on April 8, 2009 [Docket No. 12 and Docket Control No. WFH-1] (the "**Wilke Fleury Motion**"); the motion authorizing leasing was filed in the Case on April 17, 2009 [Docket No. 23 and Docket Control No. WFH-3] (the "**Leasing Motion**"); the property manager employment application was filed in the Case on the same date [same Docket and Docket Control Nos.] (the "**Property Manager Motion**"); the cash collateral motion was filed in the Case on the same date [same Docket and Docket Control Nos.] (the "**Cash Collateral Motion**"); and the second-noted borrowing motion was filed in the Case on the same date [same Docket and Docket Control Nos.] (the "**Second Borrowing Motion**"; and the First Borrowing Motion and the Second Borrowing Motion, together, the "**Borrowing Motions**").

This Objection is preliminary in that the Motions have all been made pursuant to the alternative notice procedure permitted by Local Bankruptcy Rule 9014-1(f)(2) and, accordingly, no written opposition to the Motions is required to be filed prior to the hearings

---

[1] All statutory references herein are to the Bankruptcy Code, being Title 11 of the United States Code. All uncapitalized terms that are used herein and defined or used in the Bankruptcy Code have the meanings such terms have in such code whether or not reference is made to a specific section thereof for such definition.

thereon, and any opposition thereto may be presented at those hearings. Further, the Leasing Motion, the Property Manager Motion, and the Second Borrowing Motion have been set for hearing by the Debtor at the same time as the First Borrowing Motion and the Wilke Fleury Motion pursuant to an order granting the Debtor's Application for Order Shortening Time for Hearing filed in the Case on April 17, 2009 [Docket No. 22], which order reiterates the lack of the necessity to file written opposition. Nonetheless, for the convenience of the Court, the Agent is filing this Objection to outline the Bank's objections to the Motion.

## FACTUAL BACKGROUND

As the Debtor set out in the Motions and the various pleadings it has filed in support thereof, its sole non-monetary asset is the remaining 101 unsold units of its 104 unit rental-apartment-to-condominium conversion project located at 400 – 480 Ellesmere Drive, Dixon, California (that project, the **"Project"**; and those 101 units, the **"Units"**). Three units of the Project had been sold in 2007 to condominium purchasers and, as the Debtor's efforts to market the remaining Units since then were unavailing, it appears to have leased one Unit for miniscule revenue. Of the 100 unleased Units, the Debtor appears to have completed converting or renovating only about 60 Units. The remaining 40 Units are gutted and, thus, uninhabitable—neither saleable nor rentable.

As the Debtor set out in its Schedules of Assets and Liabilities filed in the Case together with its Statement of Financial Affairs on April 21, 2009 [together, Docket No. 29] (respectively, the **"Schedules"** and the **"Statement"**), the Units are subject to two deeds of trust (together, the **"Deeds of Trust"**), both held by the Bank, securing two loans made by the Bank to the Debtor (together, the **"Loans"**). One of the Loans, that in the original principal amount of $6,000,000 (the **"Senior Loan"**), is secured by the senior in priority of the Deeds of Trust (the **"Senior Deed of Trust"**). The outstanding principal balance of the Senior Loan is approximately $5,508,000 and there is accrued but unpaid interest due thereon and attorneys fees and costs and other amounts due with respect thereto as well. The other of the Loans, that in the original principal amount of $600,000 (the **"Junior Loan"**), is secured by the junior in

PAGE 3
SF\857617v1 68712 0005

PCBB's PRELIMINARY OBJECTION TO DEBTOR'S
MOTIONS WHH-1, WFH-2, AND WFH-3

PRINTED ON
RECYCLED PAPER

priority of the Deeds of Trust (the **"Junior Deed of Trust"**). The outstanding principal balance of the Junior Loan is approximately $508,000 and there is accrued but unpaid interest due thereon and attorneys fees and costs and other amounts due with respect thereto as well. According to the Schedules, the total amount due on the Loans as of April 6, 2009 (the **"Petition Date"**), was approximately $6,390,000[2].

As the Debtor also set out in its Schedules, its has, essentially, no cash (it had approximately $5,200 in a deposit account on the Petition Date) and its only other asset was an approximately $88,300 security deposit held by the California Department of Real Estate (the **"DRE"**). The Statement shows that the Debtor's rental income from the one Unit that it had rented pre-petition is, as noted, miniscule: $180 in 2008 and $400 in 2009.

Due to its lack of income and working capital, the ongoing operations of the Debtor prior to the Petition Date appear to have been financed by cash infusions from the Debtor's manager and 99% equity owner, Frank J. Andrews (**"Andrews"**). These infusions, apparently totaling approximately $789,000, are characterized, according to the Schedules, as loans, making Andrews the Debtor's largest scheduled unsecured creditor[3]. These cash infusions appear to be net of the $61,500 transferred, for reasons not disclosed, by the Debtor to Andrews within the two weeks preceding the Petition Date.

By its condominiumization of the Project, the Debtor necessarily caused the creation of an homeowners' association and incurred obligations thereto. The Debtor discloses in the Schedules that the Project is subject to an executory declaration of restrictions (the **"CC&Rs"**) and that it has various executory contracts with Meadowood Village of Dixon Association (the **"HOA"**), including a Subsidy Contract and a Working Capital Fund Agreement, copies of which contracts—but not the CC&Rs—are the evidentiary support for the First Borrowing Motion.

\ \ \ \

---

[2] This amount does not include all amounts due the Bank under and in respect of the Loans. The Bank will, at an appropriate time, definitively state the respective amounts due under each of the Loans.

[3] Depending on the value of the Units, the Bank may have a deficiency claim with respect to one or both of the Loans, which claim or claims could exceed the amount the Debtor has scheduled as due Andrews.

Pursuant to the Subsidy Contract, the HOA waived the Debtor's obligation to pay dues to the HOA on account of the Units pursuant to the CC&Rs in exchange for the Debtor agreeing to pay various identified line items of the HOA's operating budget. That agreement, however, expired by its terms prior to the Petition Date, and it is thus not clear why it is a part of the evidentiary support for the First Borrowing Motion. Pursuant to the Working Capital Fund Agreement, in order to facilitate the obtaining of FHA insured loans by purchasers of Units, the Debtor agreed to contribute to the HOA two months of assessments for operating expenses for each Unit sold. Neither the Schedules, the Statement, the Motions, nor the evidentiary support therefor indicate what the scale is of the Debtor's obligations to the HOA under the CC&Rs or the Working Capital Fund Agreement.

The Schedules state that Andrews is a co-debtor with the Debtor. While they do not themselves state how he is so, Andrews is a co-debtor because he has guaranteed payment of both the Loans to the Bank pursuant to written Commercial Guaranties (together, the **"Guaranties"**) given in connection with the making of each Loan. Thus, not only is he the Debtor's largest scheduled unsecured creditor, he is also a contingent creditor of the Debtor with respect to his obligations under the Guaranties to the extent that he makes any payments thereunder. The Guaranties contain subordination provisions, however, and, pursuant thereto, until the Loans are paid in full, any payment or repayment rights Andrews has or would have against the Debtor, whether for reimbursement for having paid any of its indebtedness to the Bank pursuant to the Guaranties or for his claimed loans to the Debtor, are subordinated to the Bank's claims against the Debtor with respect to the Loans, and any reimbursement or loan payments otherwise due Andrews that the Debtor might make must instead be paid to the Bank on account of the Loans.

PCBB is a participant in the Senior Loan, but not in the Junior Loan. As noted above, PCBB is the administrative agent for the Bank. The Agent serves in such capacity with respect to the Senior Loan only and this Objection is made in connection with the Senior Loan only. Any position the Bank takes in respect of any of the Motions or other matters in the Case

\ \ \ \

PRINTED ON
RECYCLED PAPER

PAGE 5
SF\857617v1 68712 0005

PCBB's PRELIMINARY OBJECTION TO DEBTOR'S
MOTIONS WHH-1, WFH-2, AND WFH-3

in connection with the Junior Loan will be stated by the Bank on its own accord and not by the Agent.

# OBJECTIONS

1. <u>Objection to Wilke Fleury Motion</u>.

By the Wilke Fleury Motion, the Debtor seeks authority, pursuant to Bankruptcy Code Section 327(a), to employ the law firm of Wilke, Fleury, Hoffelt, Gould & Birney LLP (**"Wilke Fleury"**) as its general counsel in the Case.

    (a)    Professional Must Be "Disinterested" and Hold No Interest Adverse to Debtor's Estate.

Of course, under that Section 327(a), in order for the Debtor to be permitted to employ Wilke Fleury, that firm must "not hold or represent an interest adverse to the estate" and must be a "disinterested person". Bankr. C. § 327(a). In order to be a "disinterested person", of course, Wilke Fleury must, *inter alia*, "not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor, or for any other reason." Bankr. C. § 101(14)(C).

    (b)    Professional's Employment Terms Must Be Reasonable and Burden Is on Applicant and Debtor to Establish That.

Further, under Bankruptcy Code Section 328, the employment of a professional person under Section 327 must be on "reasonable terms and conditions of employment". Bankr. C. § 328(a). The burden is on "the party seeking approval of the employment of a professional to establish that the arrangement or agreement pertaining to the employment or compensation of the professional is reasonable." *In re Hathaway Ranch Partnership*, 116 B.R. 208, 219 (Bankr. C.D. Cal. 1990) [citing *In re C&P Auto Transport, Inc.*, 94 B.R. 682, 686 (Bankr. E.D. Cal. 1988)].

\\\\

\\\\

(c) **Wilke Fleury Fee Arrangements, with Andrews Paying Pre-Petition Retainer and Guaranteeing Payment of Fees Going Forward, Raises Conflict of Interest Issues.**

Because the Debtor has, as noted, essentially no cash and no current revenues beyond the miniscule rents it has indicated it receives from the one leased Unit, and, presumably because Wilke Fleury itself has no confidence in the Debtor's reorganization prospects, the terms on which the Debtor seeks to employ Wilke Fleury include that Andrews guarantee payment of its legal fees and costs and that he pay those fees on an ongoing basis as monthly invoices are rendered. Further, Andrews, rather than the Debtor, paid Wilke Fleury its required $15,000 retainer on the Petition Date[4].

These fee arrangements and Andrews's control of the Debtor and equity interests therein, and his claims and potential claims against it, raise serious issue of conflicts of interest that impact Wilke Fleury's "disinterestedness" and lack of an interest adverse to the Debtor's estate, and are, in light either of the alternative approaches to conflicted insider's payment of debtor's counsel's fees, not reasonable.

(d) **With Andrews as Debtor's Actual Creditor and Debtor's Guarantor, and As Recipient of Pre-Petition Transfers From Debtor, Interests of Andrews and Debtor in Case Are *a Fortiori* Adverse.**

While not in an entirely analogous situation with respect to retention of counsel here—since Wilke Fleury does not purport to represent Andrews individually—this Court has itself said—

> A guarantor on corporate debt has a natural conflict with the principal and with other guarantors. To be sure, the interests of principal and guarantor coalesce so long as the issue is whether anyone is liable on the claim. They become adverse upon the appearance of a genuine question about who is going to pay. Such an issue, *a fortiori*, exists whenever a key player is in bankruptcy.

*In re B.E.S. Concrete Products, Inc.*, 93 B.R. 228, 234 (Bankr. E.D. Cal. 1988).

---

[4] Since, as noted, Andrews received $61,500 in transfers from the Debtor within the two weeks prior to the Petition Date, the source of this retainer is an interesting question in itself.

With the Debtor in bankruptcy, with Andrews as a guarantor of more than $6,390,000 in debt of the Debtor to the Bank, with Andrews as a claimed creditor of the Debtor for pre-petition loans of approximately $789,000, with Andrews as the Debtor's manager and its 99% equity holder, with Andrews having received $61,500 in transfers from the Debtor immediately prior to the commencement of the Case, the interests of Andrews and the Debtor are, *a fortiori*, adverse.

    (e)  Propriety of Insider Payment of Debtor's Counsel's Retainer and Fees: "Restrictive" and "Analytical" Approaches.

In the Ninth Circuit, two lines of thought have developed on the propriety of retention of counsel by a debtor where its counsel's fees are to be paid by an insider with interests adverse to the Debtor: the "restrictive approach" and the "analytical approach". *In re Lotus Properties LP*, 200 B.R. 388, 391-395 (Bankr. C.D. Cal. 1996) [naming and discussing both approaches].

    (i)  "Restrictive Approach": *Per Se* Rule Requires Denial of Wilke Fleury Motion Because Interests Of Andrews and Debtor Are Not Identical.

Under the "restrictive approach", there is "a *per se* rule prohibiting proposed counsel from representing a Chapter 11 debtor-in-possession where counsel's fees and costs are contributed by a principal or insider of the debtor." *Id.*, at 391 [citing *Hathaway Ranch* as the most clear expression of this approach]. In *Hathaway Ranch*, the debtor's general partner paid the proposed counsel's pre-petition retainer[5]. The Bankruptcy Court there held that that payment created a conflict of interest for the proposed counsel, reasoning as follows:

> Third parties do not transfer property or funds to an attorney to represent a debtor in possession unless that representation is in the best interest of the third party. It is often the case that the interests of the third party are not identical to the interests of the debtor in possession in its role as fiduciary of the bankruptcy estate. Thus by accepting payment from a third party, the proposed counsel for the debtor in possession necessarily has a conflict of interest in that counsel is serving two masters-the one who paid counsel and the one counsel is

---

[5] Here, of course, Andrews has not only paid Wilke Fleury's pre-petition retainer, but has also agreed to pay and guaranteed payment of all Wilke Fleury's fees for its representation of the Debtor going forward.

| | |
|---|---|
| 1 | paid to represent. I find that this is an actual conflict of interest that disqualifies a professional from being employed pursuant to 11 U.S.C. § 327 absent a showing that the interests of the third party and the bankruptcy estate are identical upon notice to all creditors, equity security holders and other parties in interest. |
| 2 | |
| 3 | |

*Hathaway Ranch*, *supra*, 116 B.R. at 219.

The *Lotus* court noted several prior cases out of the Ninth Circuit that were in accord with *Hathaway Ranch*, one of which, *In re Bergdog Productions of Hawaii, Inc.*, 7 B.R. 890 (Bankr. D. Haw. 1980), is particularly applicable here. There, as here, equity security holders of the debtor not only paid the debtor's proposed counsel's retainer but also guaranteed payment of that counsel's fees going forward. The *Bergdog* court, following its own prior precedent, would not approve retention of the proposed counsel under such circumstances: "By taking payment from stockholders of the Debtor and by obtaining a guarantee of further payments from these individuals for services rendered to the Debtor, the Attorney for the Debtor will be in a conflict of interest situation." *Id.*, at 891. The Bankruptcy Court explained that—

> [N]otwithstanding his best efforts, by accepting compensation from [the debtor's principal shareholder and chief executive officer] the applicant changed an otherwise delicate situation into a situation in which an actual conflict of interest existed. Taking compensation from an individual officer poses a substantially greater temptation for the debtor's attorney to deviate from his duty of undivided loyalty to his client, the corporate debtor.

*Id.* [quoting from *In re Holiday Mart Inc.*, Bk. No. 77-00565 (Bankr. D. Haw. filed Oct. 10, 1980)].

Since the interests of Andrews and the Debtor are not identical here—given their myriad relationships, they cannot be identical—under the "restrictive approach", the Wilke Fleury Motion must be denied.

\ \ \ \

\ \ \ \

\ \ \ \

\ \ \ \

\ \ \ \

(ii) "Analytical Approach": Denial Of Wilke Fleury Motion Still Required Because Andrews Has Guaranteed Payment of Its Fees And Costs and This Creates, at Minimum, Impermissible Potential for Conflict of Interest.

Alternatively, there is the "analytical approach". That approach, which the *Lotus* court said was best embodied in *In re Kelton*, 109 B.R. 641 (Bankr. D. Vt. 1989), declined to follow "a hard and fast rule", instead taking "an equitable approach" based on a "case and fact specific" inquiry, utilizing a five-part test to serve as a guideline. *Id.*, at 657-58. But the necessary predicate to utilizing this approach, said the *Kelton* court, was that "there is no evidence of a fee guarantee or material creditor relationship between the payor-insider and corporate debtor/client", and that predicate was embodied in the fifth part of its test, that "the debtor's attorney/applicant must demonstrate and represent to the Court's satisfaction the absence of facts which would otherwise create non-disinterestedness, actual conflict, or impermissible potential for a conflict of interest." *Id.*

The *Lotus* court, which followed what it renamed the "analytical approach" of *Kelton*, had directly to address the *Kelton* court's test's fifth part because not only did the debtor's sole general partner, a guarantor of the debtor's obligations to its secured creditor, pay the debtor's prospective bankruptcy counsel's pre-petition retainer, the fee agreement expressly provided that the general partner agreed to be "personally responsible for payment of all fees and costs incurred on behalf of" the debtor, and the general partner signed that agreement individually as well as on behalf of the debtor. The *Lotus* court found that, while the interests of the general partner and the debtor were "united", they were not "absolutely identical", *Lotus, supra*, 200 B.R. at 392, and it thus proceeded to work through the five-part *Kelton* test[6].

In evaluating whether any actual conflict, non-disinterestedness, or impermissible potential for a conflict of interest was apparent from the proposed *Lotus* fee arrangements, the Bankruptcy Court was not sure what the parties had intended by providing for the "personal

---

[6] Had the interests of the debtor and its general partner been identical, the retention would not have been disapproved even under the "restrictive approach" of *Hathaway Ranch*.

responsibility" of the general partner for ongoing fees. It was developed on hearing, apparently, that all that that phrase meant was that the general partner, not the debtor, was going to be making the payments to the debtor's counsel. To avoid failure of the fifth part of the test, then, the Bankruptcy Court ruled that—

> [T]he Order on Approval for Employment must provide that [the general partner] has no *individual* legal liability for providing payment based upon the Attorney-Fee Agreement, that his contributions shall not be deemed a guarantee of the fees and expenses and, further, that those payments shall create no direct obligation by [the general partner] to counsel. With that statement clarified in the Order Approving Employment [*sic*], the fifth element of *Kelton* is met[FN3].
>
> [FN3:] With this Court's characterization of the nature of [the general partner's] payment of counsel's fees and costs as strictly voluntary, the court notes that if [the general partner] decides to withdraw funding of this administrative expense, counsel's only appropriate remedy is to serve and file a formal application to withdraw. Counsel does not have the automatic right of withdrawal. Instead, non-payment of ongoing fees will serve only as one criteria for this Court's consideration, as in any other motion to withdraw.

*Id.*, at 394 [italics in original].

Since Andrews has clearly guaranteed payment of Wilke Fleury's ongoing legal fees and costs in the Case, the Court need not decide here whether the "analytical approach" or the "restrictive approach" is the appropriate approach: even under the "pragmatic", "equitable" "analytical approach" of *Lotus* and *Kelton*, that guarantee creates non-disinterestedness and, at the least, an impermissible potential for a conflict of interest—really, here, given the actual debtor-creditor relationship between the Debtor and Andrews due to the claimed loans, the potential debtor-creditor relationship between them due to his Guaranties of the Loans, and the pre-petition transfers by the Debtor to Andrews, an actual conflict has been created—and, accordingly, the Wilke Fleury Motion must be denied under this approach as well.

\\\\
\\\\
\\\\
\\\\
\\\\

2. Objection to Borrowing Motions, Leasing Motion, Property Manager Motion, and Cash Collateral Motion.

    (a) In General: These Motions Are Premature and Debtor Needs To Determine Case Exist Strategy.

The Borrowing Motions, the Leasing Motion, the Property Manager Motion, and the Cash Collateral Motion (collectively, the **"Use Change Motions"**) are substantially interrelated. They are all predicated on the Debtor's desire to change the character of the Project from condominium sales back to residential leasing, where it was when the Debtor began it condominium conversion project there more than two years ago, and to do so on a rush basis with no evidence that doing so will improve the Debtor's prospects for reorganization.

It may be that reconversion of the Project to apartment rentals may be the best use of the Project in the current market. It may, however, be that future condominium sales would be a preferable course. Either way, in order successfully to reorganize, the Debtor will need to finance not only its ongoing operations but completion of the renovation and conversion of the approximately 40 Units that are now gutted and uninhabitable, 40% of the total number of Units, and the other needed work at the Project. It may be that, even if apartment rental use is the best use of the Project now, the Debtor will not likely be able to accomplish that and may need to sell the Units in bulk to a party that can finance the necessary remaining work, and that the Units will be more difficult to sell in bulk if they are partially tenanted rather than untenanted. It may be that, if future condominium sales are the preferable course, it will be more difficult to do so if the Units are partially leased (whether to sell leased Units to condominium purchasers or to sell condominium Units in a partially leased, partially owner-occupied Project). The Debtor has presented no evidence on any of these matters, however. In particular, there is no evidence of the value of the Units in their current condition, the cost to complete the necessary remaining work, and the impact on the value of the Units as a whole on leasing some of them now or not.

Further, the relationships between and respective obligations of the Debtor and the HOA with respect to the Project would seem to be of high importance in evaluating what is in

the best interests of the Debtor's estate and creditors to do with the Units going forward. As noted above, while the Debtor's has put into evidence with respect to the First Borrowing Motion a now-expired Subsidy Agreement and a Working Capital Fund Agreement that is predicated on condominium unit sales rather than leasing, it has not put into evidence the CC&Rs or any related DRE documents, or even provided extracted information therefrom, that would enable the Bank or the Court to evaluate the complex issues that arise when "breaking" a partially-sold condominium project back to rental use.

Answers to these questions are, the Bank believes, necessary predicates to determining whether the Use Change Motions should be granted or denied. This Case, of course, is a single asset real estate case. Fairly soon, thus, pursuant to Bankruptcy Code Section 362(d)(3), the Debtor will have to propose a plan that has a reasonable possibility of being confirmed within a reasonable time else the Bank will be entitled to relief from the automatic stay to continue with its pre-petition foreclosure and receivership proceedings[7]. What is crucial in the Case right now, then, is for the Debtor to develop a confirmable plan to emerge from the Case rather than, without any evidentiary basis, to change its business model of the past more than two years and possibly further complicate its reorganization. Further, since the Debtor has not sold any units in the Project in more than a year (the three unit sales were in 2007) and has only leased one Unit, for miniscule revenue), there can be no urgency to changing the character of the Project in the first few weeks of the Case before the Debtor figures out whether that change will enhance or impair the value of the Units, and whether it will be able to finance what it needs to complete the remaining needed work, and presents evidence to support its conclusions and financing needs and ability.

(b) **Bank Is Entitled to Adequate Protection.**

Bankruptcy Code Section 363(e), of course, provides that "at any time, on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use,

---

[7] Based on its financial condition, it seems highly unlikely that the Debtor will be able to commence making nondefault contract rate interest payments on the Loans at any time in the foreseeable future.

sale, or lease as is necessary to provide adequate protection of such interest." Bankr. C. § 363(e). The Bank hereby requests, both with respect to the Units proposed to be leased and the cash collateral, miniscule though it appears to be[8], proposed to be used, adequate protection of its interests therein under the Senior Deed of Trust. The Debtor, of course, has the burden of proof on the issue of adequate protection. Bankr. C. § 363(p)(1). Again, the Debtor has presented no evidence whatsoever that would shed light on these issues, let alone support its requested relief.

In addition to the additional grounds set out below, the Use Motions should be denied on the foregoing grounds alone.

(c) First Borrowing Motion Is Wholly Inadequate.

By the First Borrowing Motion, the Debtor seeks authority to borrow up to $30,000 per month "as needed to cover ongoing operations". In support of the First Borrowing Motion, the Debtor submits the now-expired Subsidy Contract and the irrelevant-if-Units-are-leased Working Capital Fund Agreement. That is it: no proposed loan agreement, no proposed essential terms for the requested loan (interest rate, payment date), no limit on the number of months for which borrowing is to be permitted, no budget to show for what the funds borrowed are to be used, no apparent obligation of Andrews in fact to lend, and no discussion of what the relevance to the motion is of the Subsidy Contract or the Working Capital Fund Agreement. To say the least, the First Borrowing Motion is thinly supported.

The First Borrowing Motion should be denied for lack of sufficient specificity and support.

(d) Second Borrowing Motion Is Inadequate As Well.

By the Second Borrowing Motion, the Debtor seeks authority to borrow up to $50,000 to cover the estimated operating shortfall it projects from leasing operations until projected rental receipts can cover those operations, apparently based on the Debtor's proposed

---

[8] The Bank notes that the Debtor has not indicated what the current rent generated by the one leased Unit is.

PAGE 14
SF\857617v1 68712 0005

PCBB's PRELIMINARY OBJECTION TO DEBTOR'S
MOTIONS WHH-1, WFH-2, AND WFH-3

Lease Up Budget (the **"Budget"**) that is part of the exhibit package for the collective WFH-3 motions. While not quite as thinly supported as the First Borrowing Motion, the Second Borrowing Motion also has rather thin factual support. But even before addressing the Second Borrowing Motion directly, an important question is begged by it: how does it relate to the First Borrowing Motion? Does it supplant the First Borrowing Motion or is it in addition thereto? And, if in addition, how does the $30,000 per month to be borrowed under the First Borrowing Motion figure into the Budget? Answers to these questions cannot be gleaned from the information provided.

As with the First Borrowing Motion, the Second Borrowing Motion does not indicated the essential term of an interest rate, and there is no apparent obligation of Andrews in fact to lend. Further, the apparent shortfall shown on the Budget to be covered by the borrowing under the Second Borrowing Motion is greater than the amount of that borrowing, and this assumes that the lease-up and expense projections of that budget are correct. Most importantly, there is no evidence about what the Unit rental absorption rate would be, what rent concession would be required to lease Units, or whether the anticipated expenses are, in fact, accurate and achievable. The Budget appears simply to be a generic, pro-forma budget prepared by the proposed property manager[9]. This is particularly evident because the Budget apparently projects full occupancy of the Project within 12 months, but there only approximately 60 Units that can be rented unless the Debtor is able to finance the completion of the unfinished renovation and conversion of the other approximately 40 Units. The Budget contains no capital improvement line items and there is no evidence that the Debtor will be able to finance that remaining work.

The Second Borrowing Motion contemplates that the borrowings thereunder will be repaid from rents and other income of the Debtor[10] (the First Borrowing Motion, as noted, is silent on the source and timing of repayment). The rents, issues, and profits of the Units,

---

[9] Note the disclaimer "The information contained in this budget is based on figures provided to us from sources we believe to be reliable" at the bottom of the last page of the Lease Up Budget. This is typical of a third-party prepared budget, not one prepared by a principal.

[10] The Bank is not sure what other income the Debtor would have other than rents, *etc.*, from the Units.

PAGE 15
SF\857617v1 68712 0005

PCBB's PRELIMINARY OBJECTION TO DEBTOR'S
MOTIONS WHH-1, WFH-2, AND WFH-3

however, are subject to the liens and assignments of the Deeds of Trust, and neither of the Borrowing Motions seeks to borrow on a "priming" basis to the Deeds of Trust, so repayment of the borrowings (under either Borrowing Motion) cannot come from rents without having provided the Bank adequate protection for the use of that cash collateral for such purpose.

(e) Both Borrowing Motions: Subordination Issues.

But even more important as to the repayment issue, as noted above, Andrews is a guarantor of the Loans and the Guaranties contain express subordination provisions which would require that any amounts due by the Debtor to Andrews be paid to the Bank on account of the Loans until the Loans have been paid in full. Pursuant to Bankruptcy Code Section 510(a), those provisions are enforceable in the Case to the same extent that they would be enforceable under applicable nonbankruptcy law, which is to say, they are fully enforceable. Accordingly, any repayment of any borrowings under the Borrowing Motions, if they are granted at all, must be paid over to the Bank on account of the Loans. It is not clear that Andrews is prepared to lend on this basis. In any event, if the Court determines to permit the Debtor to borrow from Andrews, it may not permit repayment of such borrowings (including interest thereon) *to Andrews* until the Loans are paid in full, such payments being required to be paid to the Bank in accordance with the subordination provisions of the Guaranties.

(f) Property Manager Motion: Inadequate Information Regarding Proposed Property Manager and Inappropriate Contract.

In addition to the Property Manager Motion being premature and factually unsupported as set out above, that motion and its supporting papers are, as with the other Motions and their supporting papers, thin on information about The Natoma Company (**"Natoma"**), the proposed property manager. The Bank does not suggest that Natoma would not be a suitable property manager (were leasing to be permitted at this time), but there are no identifications of specific properties managed by Natoma, let alone any that are comparable to the Project, there is not indication that Natoma has experience managing a condominium

project, and there are no references. At a minimum, the Bank would want to be able to have this kind of information and have the opportunity to interview Natoma and check its references so that it could independently determine its suitability.

Further, there is no evidence that the compensation arrangements for Natoma are market rate or reasonable under the circumstances (per the Budget, minimum monthly management fee of $3,500, plus resident manager's monthly salary of $3,000 plus monthly apartment allowance of $2,250—for Units that are proposed to be rented, at the high end, at $1,125 per month, which thus appears to be a two Unit resident manager's apartment).

Finally, the proposed Property Management Agreement is inappropriate in several respects, including that it contemplates that loan payments are to be made by the manager, that the manager may pay expenses without regard to any approved cash collateral budget, that the manager may file and prosecute unlawful detainer actions and, presumably, retain counsel to do so, that the manager may contract with a related entity to provide a resident manager and other service personnel and that the Debtor shall pay all the costs of the same, including an administrative fee for each employee, that the Debtor will be charged a fee for the storage of forms by the manager, that the Debtor will indemnify the manager except for the manager's willful misconduct, and that the agreement is terminable on 10 days' written notice if either the Debtor or the manager is in bankruptcy.

(g) Cash Collateral Motion: Unrealistic Budget and Other Matters.

In addition to the Cash Collateral Motion being premature and factually unsupported, including that there is no evidence that the Bank will be adequately protected as to the requested use of cash collateral as set out above, that motion is based on a budget that appears unrealistic and excessive and, in addition, runs for an excessive period of time without revisiting the Court. As noted above, the Budget appears to be a pro forma budget put together by Natoma, not the Debtor, and presumes full lease-up of the Project in a 12 month period. There is no evidence that either the income or expense numbers are realistic and achievable as set out on the Budget.

There are many line items the numbers for which appear to be mere "plug numbers". For example, laundry and vending income is budgeted at a straight $875 per month for the entire year even though there are only four units (one leased, the other three owned) that are occupied now. This suggests laundry and vending machine income is a constant no matter how occupied the Project is, which makes no sense. This does not inspire confidence in the Budget. There is also a $2,750 per month reserve provided by the Budget. No indication is given as to what this is to be used for, or how it is to be held.

Typically, of course, cash collateral budgets are handled on a rolling interim basis so that they can be negotiated and adjusted as better information becomes available. In addition, typical cash collateral orders, as non-monetary adequate protection for the secured creditor, provide a host of reporting requirements (operating reports, copies of utility bills and other invoices, *etc.*), financial tests, default mechanisms, and other provisions, none of which is offered here.

Finally, and, perhaps, most significantly—without the underlying condominium documentation, one cannot tell—no provision appears to have been made for the fact that there is an homeowners' association, the HOA, that presumably has the true legal responsibility for undertaking many of the matters contemplated to be undertaken by Natoma, that the Debtor presumably has the pre-petition obligation to pay homeowner's association dues for each Unit under an executory contract—the CC&Rs—that, perhaps, should be rejected, and that common area expenses are to be borne, in part, by the owners of the three sold units. And with respect, for example, to the above-noted laundry and vending machine income included in the Budget, this supposes that common area laundry facilities and vending machines are operated by, and thus that the income therefrom belongs to, the Debtor rather than the HOA. In any event, there being no evidence on these matters, it is impossible to evaluate the Budget against what the HOA would otherwise be obligated to do under a DRE approved budget and how much the HOA's claim against the Debtor would be under the CC&Rs.

\\\\

\\\\

PAGE 18
SF\857617v1 68712 0005

PCBB's PRELIMINARY OBJECTION TO DEBTOR'S
MOTIONS WHH-1, WFH-2, AND WFH-3

**(h) Leasing Motion: Inadequate Disclosure to Prospective Tenants.**

In addition to the Leasing Motion being premature and factually unsupported as set out above, the Bank notes that prospective tenants will be advised only that the Debtor is attempting to reorganize under Chapter 11. This seems to be an inadequate disclosure. Since the Bank may well obtain relief from the automatic stay within the next few months, surely prospective tenants should be advised that if that were to occur, their tenancies could be terminated as those tenancies are subordinate to the Deeds of Trust and could, thus, be foreclosed out.

In addition, the proposed form of lease for one-year leases does not indicate what addenda are to be included therewith. At a minimum, one would think that all tenants would be required to observe the non-monetary requirements of the CC&Rs. Since the CC&Rs have not been provided, it is, naturally, difficult to know what those would be, but the lease form contemplates an addendum for such matters.

Finally, one would think that even month-to-month tenancies, particularly as to such matters as compliance with CC&Rs, should be in writing. It does not seem to be appropriate and only invites difficulties if month-to-month tenancies are not in writing.

## CONCLUSION

For the reasons set forth above, and for any other reasons that the Agent may raise at the hearing on the Motions, they should be denied.

Dated: April 27, 2009.
JEFFER, MANGELS, BUTLER & MARMARO LLP
ROBERT B. KAPLAN
NICOLAS DE LANCIE

By: _____/s/ Nicolas De Lancie_____
Nicolas De Lancie

Attorneys for Secured Creditor
PACIFIC COAST BANKERS' BANK, as Agent